# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY,

       Plaintiff,

v.

               **MEMORANDUM OF LAW & ORDER**
               Civil File No. 12-CV-1430 (MJD/JSM)

DOUGLAS G. WEIHER,

       Defendant.

---

Benjamin C. Johnson, Benjamin J. Rolf, Erik T. Salveson, and Gregory A. Bromen, Nilan Johnson Lewis PA, Counsel for Plaintiff.

Richard D. Snyder, Fredrikson & Byron, PA, Counsel for Defendant.

---

## I.   INTRODUCTION

This matter is before the Court on Plaintiff The Northwestern Mutual Life Insurance Company's ("Northwestern Mutual") Motion for Summary Judgment [Docket No. 17] and Defendant Douglas G. Weiher's Motion for Summary Judgment [Docket No. 26].  The Court heard oral argument on February 21, 2014.

Finding no genuine issue of material fact regarding whether Defendant breached his obligation under his insurance policy, and considering the applicable case law, the Court concludes that rescission is the proper remedy for Defendant's breach.  Accordingly, the Court grants Plaintiff's Motion for Summary Judgment and denies Defendant's Motion for Summary Judgment.

## II.   BACKGROUND

### A. Factual Background

#### i. Defendant Dr. Weiher

Defendant is a 54-year-old dentist who resides in Stillwater, Minnesota.  (Weiher Decl. ¶¶ 1-2.)  Before his disability, Defendant worked for several area dental clinics, but his most recent dental practice was primarily in Hudson, Wisconsin.  (Weiher Decl. ¶ 2.)  His income since 2005 has primarily derived from his Wisconsin practice.  (Weiher Decl. ¶¶ 1-2.)  From 2006 to 2011, as Defendant's dental practice grew, his adjusted gross income steadily rose from $136,258 to $681,304.  (Weiher Decl. ¶ 3.)

### ii.  Defendant's Application for Disability Insurance From Northwestern Mutual

In 2009, due to his rising income, Defendant felt he was under-insured.  (Weiher Decl. ¶ 4.)  On June 9, 2009, Defendant met with insurance financial representative Michael Leverty in Hudson, Wisconsin to discuss disability insurance.  (Weiher Decl. ¶¶ 5-6; See Salveson Aff., Ex. F, at F19.)  Leverty is an independent insurance agent for the Bohanan Group and sells insurance for Northwestern Mutual and other insurers.  (See Salveson Aff., Ex. F, at F19-20.)  In a second meeting on June 30, 2009, Defendant and Leverty discussed disability insurance again and the policies that Defendant owned at the time.  (See id. at F18.)  Defendant owned a group policy from UNUM with a $5,000 monthly benefit ("UNUM Policy") and an individual disability policy sponsored by the American Dental Association and underwritten by Great West Life Insurance Company with a $6,000 monthly benefit ("ADA/Great West Policy").  (Weiher Decl. ¶ 4.)  Leverty requested, and Defendant provided, copies of these other insurance policies.  (Weiher Decl. ¶ 7; Snyder Decl. Exs. C, D.)  Leverty knew the monthly benefit amounts on both policies.

(Snyder Decl., Ex. E, at ML000077 (email from Leverty showing that he knew the amounts).)

On July 28, 2009, Defendant expressed to Leverty that he wanted additional disability insurance.  (Salveson Aff., Ex. F, at F14-15.)  On May 4, 2010, Defendant met with Leverty in Hudson, Wisconsin, to complete a Northwestern Mutual disability insurance application.  (Weiher Decl. ¶ 9; Hoesly Aff., Ex. H, at H26-32.)  Defendant maintains that Leverty advised him that the purpose of the application was to get Northwestern Mutual's "best offer" as to the amount of insurance it was willing to provide and that no final decision would be made until later.  (Weiher Decl. ¶¶ 9-10; Snyder Decl., Ex. B, at 106.)  Defendant asserts that Leverty explained to him that, in order to get the best offer, the application would state that Defendant would replace his ADA/Great West Policy.  (Weiher Decl. ¶ 10.) Defendant also asserts that Leverty explained that he and Defendant would discuss how to respond to Northwestern Mutual's offer, including whether to keep or replace his ADA/Great West Policy and whether to

decline, accept, or partially accept the offer.  (Weiher Decl. ¶ 10; Snyder Decl., Ex. B, at 106, 117.)

Leverty read each question on the application ("Application") to Defendant, who provided responses, and Leverty and his assistant filled out those responses on the Application.  (Salveson Aff., Ex. B, at 229-30; Snyder Decl., Ex. B, at 90; Weiher Decl. ¶ 11.)  Once the Application was completed, Defendant was able to review it; Defendant then signed the Application.  (Id.)  By signing, Defendant attested the following: "The insured consents to this application and declares that the answers and statements made on this application are correctly recorded, complete and true to the best of the insured's knowledge and belief."  (Hoesly Aff., Ex. H, at H32.)

In the Application, Defendant represented that the Northwestern Mutual Disability Income Policy ("Policy") for which he was applying would replace his ADA/Great West Policy and that he would terminate the ADA/Great West Policy by its next premium due date.  (Id. at H30).  The Application provided:

E. Will the insurance applied for replace insurance from a source other than Northwestern Mutual? . . . . Yes. [checked box]

If yes, complete the information below.  The agent should submit any required papers.

When issuing insurance as a result of this application, <u>Northwestern Mutual will rely</u> on the fact that the coverage listed below can and will be terminated by the next premium due date, which must be within 90 days of the date of this application.  If the coverage listed is not terminated by that date, or it is terminated and later reinstated, any policy issued as a result of this application <u>may be rescinded</u> and all premiums will be returned.  Northwestern Mutual may contact a listed insurer to confirm that the coverage has been terminated.

(<u>Id.</u> (emphasis added) (including a table listing the ADA/Great West Policy, with $6,000 listed as the "Amount to be Replaced").)  On May 6, 2010, Leverty forwarded copies of Defendant's 2008 and 2009 tax returns to Eric Schiesser, a lead underwriting consultant for Northwestern Mutual's home office in Milwaukee.  (Snyder Decl., Ex. F, at NM001730; <u>see</u> Seebach Aff., Ex. U.)

On May 18, 2010, by signing a Personal Health and Status Declaration, Defendant confirmed that the information on the Application had remained unchanged.  (Hoesly Aff., Ex. N.)  On May 24, 2010,

Northwestern Mutual conducted a telephone interview of Defendant to

determine his Client History.  (Manthei Aff., Ex. X.)  During the interview,

Defendant once again stated that the Policy would replace his ADA/Great

West Policy.  (Manthei Aff., Ex. X, at X25.)  Defendant then identified the

ADA/Great West Policy as his other insurance, but incorrectly stated that

the ADA/Great West Policy had a benefit of $3,500 per month, not $6,000.

(Manthei Aff., Ex. X, at X25.)

Despite this mistake, Schiesser performed a financial underwriting

analysis of Defendant.  (See Seebach Aff., Ex. U (Schiesser's financial

underwriting notes).)  First, Schiesser calculated Defendant's earned

income.  (See Seebach Aff. ¶ 5, Ex. T.)  Second, Schiesser applied that

income to the Northwestern Mutual Issue and Participation Limit Table in

effect at the time the Policy was issued.  (See Seebach Aff. ¶ 5, Ex. T.)

Based on Defendant's 2009 tax return, Schiesser initially determined that

Defendant was eligible for a disability insurance policy with a $6,000 per

month benefit; he reported this to Leverty.  (Snyder Decl., Ex. F, at

NM001813.)  Leverty questioned this amount, and Shiesser admitted that

7

he had made a mistake.  (Id. at NM001812.)  Schiesser then concluded that

Defendant was eligible for a policy with a monthly benefit of $8,420, based

on an assumption that Defendant's 2009 income was $271,550.  (Seebach

Aff. ¶ 5; Snyder Decl., Ex. G, at 39-40.)

Schiesser later stated, during his deposition, that the $8,420 monthly

benefit amount may have been too low because he may have incorrectly

reduced Defendant's 2009 income by almost $60,000.  (Snyder Decl., Ex. G,

at 48.)  Nevertheless, during this process, Schiesser concluded that Plaintiff

would offer a policy to Defendant with a monthly benefit of about $8,400,

subject to Defendant terminating his ADA/Great West Policy.  (Salveson

Aff., Ex. F, at F3; Seebach Aff. ¶ 5.)  On May 18, 2010, as a result of

Schiesser's analysis, Leverty submitted the Application, and filled in $8,400

as the monthly benefit Defendant was applying for.  (Snyder Decl., Ex. A,

at ML000112, ML000117.)  Defendant did not receive a copy of this version

of the Application.  (Snyder Decl., Ex. B, at 77-78.)

Through several emails, Leverty advised Defendant that the

maximum coverage that Plaintiff would provide was $8,400 per month if

Defendant terminated his ADA/Great West Policy.  (Salveson Aff., Ex. F.)

Despite this, Defendant expressed his desire for higher coverage (a

monthly benefit of $15,000) and asked if he could keep his ADA/Great

West Policy: "I was told that because the NW Mutual DI policy was for

$8,900/month benefit that I would NOT replace the ADA policy. (I was

looking for a monthly benefit of $15,000)  Please confirm."  (Salveson Aff.,

Ex. F, at F7 (June 1, 2010 email from Defendant to Leverty's Assistant, Ann

Urbik).)

　　　　The parties dispute whether anyone from Northwestern Mutual

ever told Defendant that he did not need to replace the ADA/Great West

Policy.  Plaintiff that no one from Northwestern Mutual or Leverty's office

told Defendant he could keep the ADA/Great West Policy.  (See Pl.'s Mem.

Supp. Mot. Summ. J, at 6.)  Defendant argues that Leverty told him that,

based on Defendant's 2008 income, he could get additional disability

coverage through Northwestern Mutual and supplement the existing

UNUM and ADA/Great West policies.  (Weiher Decl. ¶ 8; Snyder Decl., Ex.

B, at 66; Snyder Decl., Ex. E, at ML000073.)  Defendant also claims that

Leverty told him there would be future opportunities to increase his benefit as his income continued to rise.  (Weiher Decl. ¶ 8.)

In any case, after receiving Defendant's email claiming that he was told he could keep his ADA/Great West Policy, Leverty responded that the Policy would have a maximum monthly benefit of $8,400 provided Defendant terminated his ADA/Great West Policy.  (See Salveson Aff., Ex. F; Seebach Aff. ¶ 5.)

On June 25, 2010, Defendant signed a Northwestern Mutual form entitled "Notice to Applicant Regarding Replacement of Accident and Sickness Insurance."  (Hoesly Aff., Ex. Q.)  This form represented that Defendant planned to terminate his ADA/Great West Policy and replace it with the Northwestern Mutual Policy.  (Id. ("According to your application, you intend to lapse or otherwise terminate your present policy and replace it with a policy to be issued by The Northwestern Mutual Life Insurance Company.").)

### iii.   Plaintiff Issues Policy to Defendant

A Northwestern Mutual underwriter reviewed the Application,
Amendment of Application, and other materials submitted regarding
Defendant.  (See Seebach Aff., Ex. V.)  The underwriter verified answers to
Defendant's medical and financial questions, collected medical records
from Defendant's medical providers, and had medical professionals within
Northwestern Mutual's home office determine Defendant's insurability.
(Snyder Decl., Ex. H, at 20-21.)  On June 2, 2010, in the middle of the
underwriting process, Leverty asked the underwriter if Defendant's
ADA/Great West Policy could remain in place with the Northwestern
Mutual Policy to supplement it (and the UNUM policy).  (Seebach Aff., Ex.
V, at V4-5.)  The underwriter told Leverty that the ADA/Great West Policy
could remain in place, but that the monthly benefit for the Northwestern
Mutual Policy would only be $5,000.  (Snyder Decl., Ex. B, at 144-45.)

On June 22, 2010, the underwriter asked Leverty to confirm whether
Defendant was replacing the ADA/Great West Policy: "We need to
confirm the status/intention of the ADA coverage for $3,500.  Is he

replacing?  If yes, what is the termination date?  If yes, then we need

replacement forms.  If no, the amount of the policy will be reduced to

$5,000."  (Seebach Aff., Ex. V, at V5.)

Sometime around July 1, 2010, the underwriter printed the Policy,

with the understanding that the ADA/Great West Policy would be

terminated, and sent it to Leverty to deliver to Defendant.  (Snyder Decl.,

Ex. F, at NM000543.)  In a letter to Leverty, the underwriter also asked him

to have Defendant sign an Amendment of Application to Northwestern

Mutual ("Amendment of Application") to confirm that Defendant would

cancel the ADA/Great West Policy by its next premium due date.  (Id.)

During a July 20, 2010 meeting with Defendant, Leverty asked

Defendant to sign the Amendment of Application and also delivered the

Policy to Defendant.  (Weiher Decl. ¶ 22; Hoesly Aff., Ex. P.)  Defendant

signed the Amendment of Application, in which he again represented that

he would terminate the ADA/Great West Policy by the next premium due

date.  (Hoesly Aff., Ex. J ("I agree to terminate the insurance listed below

by the next premium due date.") (listing the "ADA" insurance with an

12

amount of "$3,500" and the termination date/premium due date of "July 11, 2010").)

The Amendment of Application also provided that, if Defendant did not terminate the ADA/Great West Policy, then "any policy issued as a result of this application may be rescinded and the premiums returned." (Id.)  Finally, the Amendment of Application provided that Defendant was aware of Plaintiff's reliance on the agreement: "I understand Northwestern Mutual Life is relying on this agreement and would not have issued a policy without this agreement."  (Id.)

Defendant also received the Policy itself on July 20, 2010, during the meeting with Leverty, and the front of the Policy conspicuously provided the following:

> Omissions or misstatements in the application could cause an otherwise valid claim to be denied. Carefully check the application and write to [Northwestern Mutual] within 10 days, if any information shown on it is not correct and complete . . . . The application is a part of the policy and the policy was issued on the basis that the answers to all questions and the information shown on the application are correct and complete.

(Hoesly Aff., Ex. H, at H2 (with the text above enclosed within a box).)

Defendant never advised Plaintiff that there were omissions or

misstatements on the Application.  (Salveson Aff., Ex. A, at 140-41.)

### iv.  Defendant Suffers an Illness

In 2012, Defendant began to experience neurological and

autoimmune symptoms, specifically general weakness and difficulty

climbing stairs.  (Weiher Decl. ¶ 26.)  He also began having vision

problems and neck pain that radiated into his left hand.  (Id.)  Pain in his

right hand also developed, and he had difficulty holding dental

instruments.  (Id.)  After visiting several doctors, Defendant was told that

he had a herniated disc and that he might have myoesthesia or another

autoimmune disease.  (Id. ¶ 27.)  Defendant eventually concluded that he

could no longer safely or effectively practice dentistry.  (Id.)

### v.  Plaintiff's Discovery that Defendant Had Failed to Terminate His ADA/Great West Policy

On April 23, 2012, Defendant initiated the process of submitting a

claim to Plaintiff for total disability benefits.  (Snyder Decl., Ex. F, at

NM001459.)  Because the claim was made within two years after issuance

of the Policy, Plaintiff conducted a routine case review of Defendant. (Hoesley Aff., Ex. O, at O3.)  On April 26, 2012, Plaintiff received confirmation from Great West Life Insurance Company that Defendant never terminated his ADA/Great West Policy and that that policy was still in force.  (See Hoesly Aff., Ex. S.)

Plaintiff then conducted a detailed review of Defendant and applied its underwriting standards.  (Hoesly Aff., Exs. O, R; Seebach Aff. ¶¶ 3-4.) Plaintiff concluded that it would not have issued the Policy had it known that Defendant would not terminate the ADA/Great West Policy.  (Seebach Aff. ¶¶ 7-8, Ex. W.)  Seebach found that, at most, Defendant would have been eligible for a policy with a $2,500 monthly benefit.  (Seebach Aff. ¶¶ 7-9, Ex. W.)

On May 24, 2012, Plaintiff rescinded the Policy, sending a letter to Defendant denying its obligation to pay benefits.  (Hoesly Aff., Ex. O, at O3-5.)  The letter stated that Plaintiff was rescinding the Policy because answers to certain questions on the Application were incorrect, including

Question No. 12E, which asked whether the Policy would replace any

other policy.  (Id.)  The letter provided:

> Northwestern Mutual relied on the truthfulness and completeness of your answers to the questions in the Policy application when issuing the Policy in accordance with the underwriting guidelines in effect at that time.
>
> However it is clear that you did not provide complete and truthful information on the application for [the] Policy . . . . As a result our Company was prevented from making an appropriate underwriting decision at the time of application for [the] Policy . . . .

(Id. at O4.)

### vi.  Other Disability Claims

Defendant made disability claims to UNUM and Great West for

disability benefits.  (Weiher Decl. ¶ 28.)  Both companies investigated his

claims by requesting and analyzing his medical records.  (Id.)  UNUM also

confirmed Defendant's disability after asking Defendant to undergo an

independent medical examination and collecting a report from UNUM's

neurologist.  (Weiher Decl., Ex. B.)  Great West and UNUM are currently

paying Defendant full disability benefits.  (Weiher Decl. ¶ 29.)

16

### B. Procedural Background

On June 15, 2012, Plaintiff commenced this action seeking

confirmation of its rescission of the Policy.  [Docket No. 1]  Defendant

answered and asserted counterclaims for disability benefits under the

Policy.  [Docket No. 6]  Both parties have filed motions for summary

judgment.  [Docket Nos. 17, 26]

## III.   DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light

most favorable to the non-moving party, there is no genuine dispute as to

any material fact, and the moving party is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23

(1986).  The party seeking summary judgment bears the burden of

showing that there is no disputed issue of material fact.  Celotex, 477 U.S.

at 323.  "A dispute is genuine if the evidence is such that it could cause a

reasonable jury to return a verdict for either party; a fact is material if its

resolution affects the outcome of the case."  Amini v. City of Minneapolis,

643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).

### B.  Choice of Law

The parties have presented extensive arguments regarding whether Wisconsin or Minnesota law applies to this matter.  After considering (1) the intent of the parties demonstrated by an amendment clause in the Policy, (2) the circumstances of the Policy's creation and the parties' relationship, and (3) the outcome of analysis under the applicable statutory schemes of Wisconsin and Minnesota, the Court concludes that Wisconsin law applies to this matter.

In diversity cases, federal courts must follow the choice of law provisions of the state in which they sit to determine the substantive law to be applied in cases before them.  <u>See</u> <u>Klaxon Co. v. Stentor Electric Mfg. Co.</u>, 313 U.S. 487, 496 (1941).  "Minnesota courts are committed to the rule that parties may agree that the law of another state shall govern their agreement and will interpret and apply the law of another state where such an agreement is made."  <u>Schwan's Sales Enters., Inc. v. SIG Pack, Inc.</u>,

18

476 F.3d 594, 596 (8th Cir. 2007) (internal quotation marks omitted) (citing

Milliken & Co. v. Eagle Packaging Co., 295 N.W.2d 377, 380 n.1 (Minn.

1980)).   Furthermore, "Minnesota law respects choice-of-law provisions in

insurance contracts."   Allianz Ins. Co. of Canada v. Sanftleben, 454 F.3d

853, 856 (8th Cir. 2006).   Accordingly, if the parties have acted in good

faith, Minnesota courts enforce choice of law clauses and apply the

substantive law that the parties agreed to.   Superior Edge, Inc. v. Monsanto

Co., 964 F. Supp. 2d 1017, 1031 (D. Minn. 2013).   When assessing the scope

of a choice-of-law provision, courts apply ordinary principles of contract

interpretation.   See Inacom Corp. v. Sears, Roebuck & Co, 254 F.3d 683 (8th

Cir. 2001).

Here, the Policy, by its terms, uses the law of the "State of Issue"

(Wisconsin) to amend itself.   Section 8.6 of the Policy provides: "Any

provisions of this policy which, on the Date of Issue, are in conflict with

the statutes of the State of Issue on that Date are amended to conform to

such statutes."   (Snyder Aff., Ex. I, at 18 of 37.)   This provision does not

employ the language of a typical express "choice-of-law" provision, but it

19

is indicative of the parties' intent that the laws of Wisconsin, where the

Policy was issued, at least play a substantial role in shaping the Policy.

The broader intent for Wisconsin law to govern the policy and disputes

arising from it is, at best, implied.  However, it is significant that the

parties created the Policy to automatically conform to Wisconsin's statutes

where necessary.  Furthermore, it is notable that the Policy's provisions

regarding rescission—which is the central issue in this matter—were

subject to this amendment.  Seeing no bad faith, the Court concludes that

this clause contains a strong enough reference to Wisconsin law to favor its

application in this  matter and preclude the Court from reaching a choice-

of-law analysis it would otherwise perform had the parties' intent

regarding choice-of-law been completely absent from the Policy.

Furthermore, application of Wisconsin law in this matter is

supported by the underlying facts surround the creation of the Policy and

the parties' relationship.  Defendant worked primarily in Wisconsin; his

income derived primarily from his dental practice in Wisconsin; the Policy

was solicited and formed in Wisconsin; and the Policy was issued for

delivery and delivered in Wisconsin.  Considering these facts along with the Policy's amendment provision, it was the reasonable expectation of the parties that Wisconsin law governed the Policy.

Additionally, after having extensively considered both states' bodies of law, the Court concludes that the outcome under both statutory schemes would favor Plaintiff.  Were the Court to apply the laws of Minnesota, Plaintiff would still prevail on summary judgment, and its rescission of the Policy would be confirmed.[1]  Additionally, both parties contend that they will prevail regardless of which state's law is applied. Such consistency of result usually requires the Court to apply the law of

---

[1] Because Defendant's promise to terminate his ADA/Great West policy was not a misrepresentation of present fact, but rather a breach of warranty, Minn. Stat. § 62A.06, subdiv. 3—which governs false statements—would not apply; instead, the common law of Minnesota would apply. See,e.g., PHL Variable Ins. Co. v. 2008 Christa Joseph Irrevocable Trust, 970 F. Supp. 2d 932, 941 (D. Minn. 2013) (applying common law where a rescission case involving misrepresentation happened to "fall between statutory cracks").  Under the common law, "a breach of a warranty in a policy of insurance voids the policy, without regard to whether the statement warranted relates to a material or an immaterial fact."  First Nat'l Bank v. Nat'l Liberty Ins. Co., 194 N.W. 6, 7 (Minn. 1923); see Interstate Indem. Co. v. Ulven, No. 07-cv-4029, 2009 WL 2208213, at *5-6 (D. Minn. July 22, 2009).  Because the undisputed facts show that Defendant breached his warranty promising to terminate the ADA/Great West Policy, the Policy is void and Plaintiff is entitled to rescind it under Minnesota law.  Furthermore, even if Minn. Stat. § 62A.06, subdiv. 3 applied, Plaintiff has shown, by a preponderance of the evidence, that Defendant made a false representation by stating he would cancel his ADA/Great West Policy, and this representation was material because Plaintiff would not have issued the Policy had the representation not been made.

the forum.  See Milwaukee Mut. Ins. Co. v. Deere & Co., No. 04-4905, 2005

WL 2105513, at *2 (D. Minn. Aug. 25, 2005).  However, here, because of the

existence of the amending clause in the Policy, the Court has not reached

even the preliminary inquire of the choice-of-law analysis.  The

consistency of result under both statutory schemes, then, merely suggests

that it is not prejudicial to apply the statutory scheme to which that the

parties intended the Policy to conform.

### C.  Whether Plaintiff Properly Rescinded the Policy

The Court concludes that Plaintiff properly rescinded the Policy

because (1) Defendant agreed to replace his existing ADA/Great West

Policy; (2) the Application and Amendment to Application explained that

failure to do so would result in rescission, and (3) Defendant indeed failed

to terminate his ADA/Great West Policy, which increased the risk to

Plaintiff.  Plaintiff's rescission of the Policy was proper under Wisconsin

law.

It is undisputed that Defendant breached the Policy, as he failed to

perform under the Application and Amendment of Application.

Defendant, however, argues that rescission is not the proper remedy for

his breach under Wisconsin law.  The Court disagrees.

Wisconsin Statute § 631.11(3) provides that:

No failure of a condition prior to a loss and no breach of a
promissory warranty constitutes grounds for rescission of . . .
an insurance policy unless it exists at the time of the loss and
either increases the risk at the time of the loss or contributes to
the loss.

Wisconsin law also provides that:

(c) An insurer which issues coverage for a person shall not use
the statements, information or material set out in subds. 1., 2.
and 3. to void the coverage on the basis of misrepresentation
in the application, or deny a claim on the basis of a pre-
existing condition defense, unless the insurer has:

1. Resolved patently conflicting or incomplete statements in
the application for the coverage;

2. Duly considered information furnished to it:

a. In connection with the processing of such application,
or

b. In connection with individual coverage on the person
previously issued by it and currently in force, or

3. Duly considered the material which it would have obtained
through reasonable inquiry following due consideration of the
statements or information.

Wis. Admin. Code Ins. § 3.28(5)(c)(3).

23

### i. Increase of Risk

That Defendant's breach existed at the time of the loss is undisputed and well-established by the facts. Therefore, the first issue is whether Defendant's breach indeed increased the risk to Plaintiff. Defendant argues that Plaintiff cannot meet its burden of proof to rescind the Policy under this section because Plaintiff cannot show that Defendant's actions "increase[d] the risk at the time of the loss." Wis. Stat. § 631.11(3). Defendant relies upon Wisconsin's civil jury instructions in explaining that "the risk" is the risk that Plaintiff insured against in the Policy:

> The word "risk" refers to the risks the company insured against in its policy. Risk is increased wherever the chance of loss is increased by a failure of the condition or breach of promissory warranty . . . . Any contribution whether great or small to the loss . . . is sufficient.

(See Wis. JI-Civil 3105, Docket No. 31, Ex. N.) Defendant concludes that the risk in the present case is the risk that Defendant would become disabled; it is not the financial risk posed to Plaintiff. Defendant argues that his failure to terminate the ADA/Great West Policy did not increase the chance of the risk here because the risk that Defendant would become disabled has nothing to do with the fact that he had other insurance.

24

The Court finds Defendant's argument to be unpersuasive.  Such a definition of "the risk" is unreasonably narrow and unsupported. Defendant's interpretation would allow for insureds to breach promises to terminate other policies without consequence.  Rather, a more reasonable interpretation of the "risk" is broader; it is the general risk that the insured will become and stay disabled.  In other words, "the risk" is that an insured will lose income as a result of a disability and would make or perpetuate a claim for disability benefits.

Defendant's failure to terminate his other disability insurance policy increases this risk because over-insured individuals are more likely to feign disability and less likely to seek treatment in order to return to work after developing a disability.  See, e.g., Manzella v. Paul Revere Life Ins. Co., 872 F.2d 96, 99 (5th Cir. 1989) (holding that an insured's failure to disclose another disability policy increased the risk to the insurer because over-insured individuals are more likely to not to return to work); McDaniel v. Physicians Mut. Ins. Co., 621 S.W.2d 391, 391 (Tenn. 1981) (holding that a failure to disclose additional coverage would leave a

person over-insured and reasonably affect an insurer's decision to issue

coverage if known, therefore increasing the risk to an insurance company

as a matter of law).

Even the best-intentioned over-insured individuals have little

incentive to work for an income that is close to or less than their disability

income:

> People who know that their full income will continue after
> they stop working may take more risks in their daily lives and
> will not try as hard to return to work after injury or illness;
> some insureds will fake the existence of a disability or
> exaggerate its severity.  The closer the disability benefit to
> 100% of earned income, the greater the moral hazard.

Hall v. Life Ins. Co. of N. Am., 317 F.3d 773, 775 (7th Cir. 2003).

Plaintiff's Financial Underwriting Standards illustrate this point in

the context of this case: "The company is concerned about over-insurance

because experience has shown that it leads to an increase in the number of

claims and an increase in the length of claims."  (Seebach Supplemental

Aff., Ex. Y.)  Plaintiff's standard on Issue and Participation Limits also

furthers this idea: "It is undesirable to allow so much coverage that the

insured is better off, financially, after disability than before disability.

Such a situation makes it tempting to even highly motivated people to continue receiving benefits rather than return to work."  (Id., Ex. Z.)

Here, Defendant certainly increased the risk by failing to terminate his ADA/Great West Policy because the presence of that policy put Defendant closer to receiving his earned income, which increased the risk that he would become and stay disabled by perpetuating his claims rather than undertaking medical treatment and other measures to recover. Defendant's promise to cancel his other policy caused Plaintiff to accept this unwanted risk.

Defendant's argument he was not over-insured in 2012 (i.e., "the time of the loss") because his income more than doubled between the time he applied for the Policy and 2012 when he submitted a claim under the Policy is not compelling.  This change in Defendant's income is irrelevant. Defendant created a binding contract in 2010, and even if his income increased, his disability benefits were nevertheless closer to his earned income than they otherwise should have been under the Policy.

Accordingly, the Court concludes that Defendant's breach increased the risk to Plaintiff.

### ii.  Proper Action Prior to Rescission

The second question to consider in determining whether Plaintiff properly rescinded the Policy is whether Plaintiff took the proper steps under Wisconsin law before rescinding the Policy.  Defendant argues that, pursuant to Wis. Stat. 631.36(2)(a)(3), Plaintiff should have cancelled, not rescinded, the Policy upon learning that Defendant had not terminated the ADA/Great West Policy as promised.  Defendant asserts that, under Wisconsin law, an insurer cannot rescind a policy unless it has first "[d]uly considered the material which it would have obtained through reasonable inquiry following due consideration of the statements or information" in the application.  See Wis. Admin. Code Ins. § 3.28(5)(c)(3); Pum v. Wis. Physicians Serv. Ins. Corp., 727 N.W.2d 346, 355 (Wis. Ct. App. 2006). Defendant concludes that, because Plaintiff made no inquiry to him about the ADA/Great West Policy, it is not able to rescind the Policy.

The Court disagrees.  Plaintiff has provided ample evidence that it "duly considered" material obtained directly from Great West after it inquired about Defendant's ADA/Great West Policy during its routine processing of Defendant's claim.  Defendant's argument that Plaintiff failed to duly consider information justifying its rescission of the Policy is without merit.

Defendant presents a few remaining arguments that the Court will address.  First, Defendant argues that he simply signed the Application and Amendment of Application; he did not fill out any other information on those documents and did not read the documents before signing them. (See Salveson Aff., Ex. A, at 62-63.)  This failure to read the documents is irrelevant; Defendant is bound to their terms despite having not read them.  See Martinson v. N. Cent. Life Ins. Co., 222 N.W.2d 611, 616 (Wis. 1974) ("[O]ne who accepts a written contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation, or other wrongful act by another contracting party . . . .") (citation omitted).

Defendant also argues that he intended to terminate the ADA/Great West Policy, but he thought that Leverty would terminate the policy himself or contact Defendant to prompt him to do so.  Defendant asserts that Leverty's office had initiated and handled every other insurance-related task, so it was only reasonable for him to assume that Leverty would complete the task of terminating the ADA/Great West Policy.  This argument fails for several reasons.  First, the Application and Amendment of Application provide that the obligation to terminate the ADA/Great West Policy was Defendant's obligation.  (See, e.g., Hoesly Aff., Ex. J ("I agree to terminate the insurance listed below by the next premium due date.").)  Second, Leverty and his staff sent numerous emails to Defendant which communicated that Defendant was required to terminate the policy. (See Salveson Aff., Ex. G.)  Third, Leverty could not terminate the ADA/Great West Policy because he is not a party to the contract that creates that policy and therefore has no legal authority to terminate it. Finally, Defendant's continued payments on the ADA/Great West Policy and his submission of a claim for disability benefits under that policy

30

demonstrate that Defendant knew the ADA/Great West Policy had not

been terminated by Leverty or anyone else.

Finally, Defendant argues that the Amendment of Application did

not apply because it is ambiguous; it mistakenly refers to the ADA/Great

West Policy as having a $3,500 coverage amount per month when the

ADA/Great West Policy in fact has a $6,000 coverage amount.  Defendant

asserts that Leverty made this mistake and suggests that it is a

misrepresentation that should relieve him of his obligation.  This

discrepancy regarding the coverage amount is irrelevant because the

difference in amount had no effect on Defendant's obligation; the

understanding was that Defendant would replace his ADA/Great West

Policy in full, regardless of its amount.

Because Defendant's breach of the Policy increased the risk to

Plaintiff and because Plaintiff took the necessary steps required by

Wisconsin law before rescinding the Policy, the Court concludes that the

rescission was valid.  Ultimately, Defendant agreed to the terms of the

Application and Amendment of Application, which required him to

terminate his ADA/Great West Policy.  These documents contained

provisions that specifically warned of rescission in the event of

Defendant's failure to reduce his other insurance.  That rescission was

valid and properly executed under Wisconsin law.  For these reasons, the

Court grants Plaintiff's motion for summary judgment.

### D. Disability Counterclaim

Defendant has asserted a counterclaim for benefits under the Policy.

Because the Court has held that the Policy was properly rescinded by

Plaintiff, the Policy is no longer in effect and Defendant cannot make a

disability claim for benefits.  Accordingly, Defendant's counterclaim fails,

as does his request for attorney's fees.  The Court denies Defendant's

motion for summary judgment.

Accordingly, based on all the files, records, and proceedings

herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiff The Northwestern Mutual Life Insurance Company's

        Motion for Summary Judgment [Docket No. 17] is **GRANTED**; and

2.      Defendant Douglas G. Weiher's Motion for Summary Judgment

        [Docket No. 26] is **DENIED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


        Dated:   August 12, 2014                s/ Michael J. Davis_____
                                                Michael J. Davis
                                                Chief Judge
                                                United States District Court